

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-25-00526-CV

_____

IN THE INTEREST OF M.S., A CHILD

On Appeal from the 231st District Court
Tarrant County, Texas
Trial Court No. 231-661682-19

Before Sudderth, C.J.; Kerr and Walker, JJ.
Memorandum Opinion by Justice Walker

# MEMORANDUM OPINION

## I. INTRODUCTION

In 2019, the trial court signed an agreed order establishing the parent–child relationship between M.S. (Matthew) and R.S. (Father) and appointing Father and Appellant J.F. (Mother) as Matthew's joint managing conservators.[1] In 2025, following a deterioration of Mother's mental health, the trial court modified the conservatorship of Matthew by appointing Father as sole managing conservator and appointing Mother as possessory conservator with supervised visitation.

In her sole issue,[2] Mother argues that because the evidence was factually insufficient to show a material and substantial change in her circumstances, the trial court abused its discretion by modifying the 2019 order and appointing her as possessory conservator with supervised visitation. Because the trial court could have reasonably found that Mother's deteriorating mental health was a material and substantial change to support modification, we will affirm.

---

[1]We use the alias "Matthew" to identify the child and refer to his family members by their relation to him. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2]Although Mother's brief purports to present two issues, she effectively consolidated her factual sufficiency and conservatorship and access issues into one legal analysis and argument—and we will do the same.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Father and Mother are the parents of Matthew, a six-year-old boy with high-functioning autism and delayed speech. In 2019, following a petition to establish the parent–child relationship, the trial court signed an agreed order that, among other things, appointed Father and Mother as joint managing conservators of Matthew and gave Mother the exclusive right to determine Matthew's primary residence.

Sometime in the summer of 2024, Mother began experiencing episodes of delusions and paranoia,[3] and she was prescribed various medications.[4] In October 2024, she abruptly stopped taking the medications and instead began treating her mental-health issues with meditation and guidance from tarot cards. Mother's episodes of psychosis increased in frequency.

In December 2024, pursuant to a mental-health warrant, Mother was involuntarily transported to John Peter Smith Hospital (JPS) for evaluation. While at JPS, Mother made several concerning statements to medical providers—including that she had cameras in her eyes and had died at six years old—and she was admitted for psychiatric treatment for nine days. During her JPS stay, the Texas Department of Family and Protective Services (the Department) opened an investigation. A

---

[3]There is no evidence that Mother experienced these episodes of psychosis prior to the trial court's 2019 order appointing her and Father as joint managing conservators.

[4]Mother's prescribed medications included Xanax, Ambien, Zofran, Pristiq, phentermine, Soma, and Tylenol 3.

caseworker with the Department spoke with Father—who currently had physical possession of Matthew—and discovered that Mother had become obsessed with conspiracy theories and reading tarot cards and that her mental health had deteriorated since the Department's last investigation.[5]  Father also explained that Mother had hidden weapons in their apartment, that he and Mother had recently ended their relationship, and that he had moved out of the apartment.  Following Mother's release from JPS, she and Father got into an argument, and he allowed her—despite her mental-health issues—to take Matthew.

Consequently, the Department filed an original petition for protection of a child, for conservatorship, and for termination in suit affecting the parent–child relationship.  Following the petition, the trial court appointed the Department as temporary managing conservator of Matthew, appointed an attorney ad litem for him, and appointed CASA of Tarrant County to act as a court-appointed special advocate. The Department created service plans for Father and Mother, and Mother's service plan included "[m]ental health assessment with either MHMR or JPS, individual

---

[5]Between October 2024 and November 2024, the Department received two intakes for Mother's neglectful supervision of Matthew.  The first intake followed law enforcement's welfare check on Mother because she was found wandering around a store with Matthew.  The second intake followed Father's contacting an employee assistance program regarding his concerns for Mother's erratic behavior and Matthew's safety.  Mother had stopped eating, sleeping, and taking care of herself and Matthew, and she had begun excessively reading tarot cards, giving away large sums of money—$6,000 to someone she did not know—and making videos of herself with Matthew in public streets, stating that everyone was out to kill them.

4

counseling, parenting classes, co-parenting classes with [Father], refraining from criminal activity, visitation with [Matthew], communication with [the Department], housing, and employment."

In February 2025, at the Department's request, the trial court appointed Father as temporary possessory conservator of Matthew. In September 2025, the Department moved to modify the managing conservatorship of Matthew—requesting that the trial court remove the Department as temporary managing conservator, appoint Father as permanent sole managing conservator, and appoint Mother as possessory conservator.

In October 2025, the case was called to trial. The trial consisted of the admission of one exhibit—Mother's December 2024 JPS records; the testimony of Mother, the caseworker, and Father; and statements from Matthew's attorney ad litem and the court-appointed special advocate.

The admitted JPS records include the following relevant excerpts:

- [Mother] is a 46[-year-old] female with a past psychiatric history of anxiety, psychosis, schizoaffective disorder who is admitted to TSP on OPC for psychosis, delusions, and concern for harm to self and harm to others. The patient required emergency medication at the PEC due to disruptive behavior.

- Thought process is illogical, disorganized, tangential, and circumstantial. Reports passive SI "I rather die tha[n] have to live like this" and depressive symptoms including hopelessness, helplessness, isolation, sadness, mood swings, irritability and racing thoughts.

- [Mother] states that she knows that there are cameras in her apartment that have been watching her and her son for the past 4 years, however, she just found out recently on Facebook about these cameras. When this provider mentions that this sounds like the movie "The Truman Show", patient states "exactly! That's how Hollywood gets their ideas." Also states that she has cameras in her eyes that other people can watch and can see what she is seeing, states she knows this because people were post[ing] about what they [saw] on Facebook.

- States that everybody in her family is out to kill her because she is said to inher[it] a lot of money from her grandfather. Says that all of this started because her husband asked her "why does everybody want to kill [you]?"

- Discussed getting labs and getting head imaging, [Mother] states that she has already had imaging of her head which shows a bullet hole in the front of her skull from her last death.

- "Repeated mention of her death in present and past lives. Constant reference of the matrix and false realities, mood swings happy then angry. Claims she is god chosen one to see the world. Has accused everyone of trying to kill her. Very delusional in her texts and [Facebook] posts. She's always been unable to stay on task. Would rather watch tarot cards. She's obsessed with tarot cards and they are in control of her mind. . . . Believes she has died. Writes all over the living room floor and draws symbols, drawings, reference of her own demise. . . . She thinks people are watching her at home and basically a kill or be killed. No sleep, no food and she stopped taking her meds."

- [Mother] spoke to how she has experienced ego death which has [led] to "the downloads coming" and that she has died multiple times and speaks about how she can just die again given her multiple previous deaths. [Mother] believes that she actually died at age 6 in Colorado and that she is being used as a tool by the powers at be to unify everyone. [Mother] reports this is true because she has knowledge of a space craft and thinks that her dying may be tied to human trafficking. [Mother] states she was supposed to receive a multi million dollar inheritance that people

6

in her life have taken from her, and while sharing information about this inheritance she reveals she [is] connected to several powerful companies/people such as Merrill Lynch, the Kennedy's, and Bank of America. [Mother] says she feels when she is sleeping someone is inhabiting her body and that she is being raped over and over again, and that people have been inhabiting the body of her 5[-]year[-]old son when he is sleeping as he has started acting like he doesn't know her. . . . [Mother] also reports how she "knows too much" and this puts her in a "weird position" as she has been chosen by everyone's ancestors to stop the country from being run by the government. When asked about writing symbols in her residence [Mother] states she spends most of her day "running calculations and solving problems."

Mother testified and denied telling medical providers that cameras were in her eyes, that other people could watch and see her, or that she was dead and had died many times. But when confronted with the JPS records of her making these statements, Mother stated, "They would be lying. Because, no, I did not state that." When asked why Matthew was removed from her care, Mother responded, "I believe because [Father] was upset at the fact that I had spoken to one of my exes[,] and he got upset with that. And also I believe, again he's -- he is working with my parents and is part of stealing some of my inheritance, and I've got proof of that."

With respect to her employment status, Mother claimed to "do stuff on the side for the government," such as working on "[s]pecial projects." Mother explained that she worked on "undercover stuff" for the Drug Enforcement Agency (DEA) and

that she was currently investigating her sizable stolen inheritance.[6] When asked why the DEA was interested in her inheritance, Mother contended that "the entire government [was] because it's a big, big inheritance that was left to me[,] and it was stolen."

Regarding her service plan, Mother conceded that she had not (1) reviewed the permanency report, (2) attended parenting classes, (3) participated in a mental-health consultation with MHMR or JPS, (4) engaged with a counselor that was provided by the Department, or (5) regularly visited with Matthew. As for Father's supervision of Matthew, Mother agreed that Matthew was a happy, healthy child. Finally, Mother denied experiencing any psychosis since December 2024.

The caseworker testified and explained that the Department's primary concern with Mother was her mental health and that she had not substantially engaged in her service plan. Mother had not completed any kind of mental-health treatment, failed to engage in individual counseling, and repeatedly denied the Department entry to her apartment. And despite the Department's providing transportation and alternative meeting locations for her, Mother missed several visitations—including for a period of three months—with Matthew. When asked why the Department was requesting that Father be appointed as sole managing conservator, the caseworker explained, "[Matthew] has been in his care since February. He's done well with [Matthew's]

---

[6]Mother offered no evidence in support of her claim that she was employed by the DEA.

8

treatment, enrolling [him] in school, continuing his education, getting services started up for speech therapy and play therapy. He's addressed all the needs for [Matthew]. The Department still has concerns for [Mother's] mental health." With respect to whether Mother's mental health had improved since the beginning of the case, the caseworker responded, "I haven't seen improvement."[7] Although Mother did complete a psychological evaluation, the caseworker explained that the results of that evaluation "[c]ontinued the [Department's] concerns."

Unlike Mother, Father had substantially engaged in his service plan. He completed a psychological examination, participated in counseling, attended parenting classes, remained employed, and maintained housing. The Department had no concerns regarding Father. Thus, the Department requested that Father be appointed as sole managing conservator of Matthew and requested that Mother be appointed as possessory conservator with supervised visitation. And although Matthew was bonded to both of his parents, the caseworker explained that she believed the requested conservatorship was in Matthew's best interest because (1) Mother's mental-health issues had not been addressed, (2) the plan would keep Matthew "safe and free from danger or harm," and (3) the parents might have trouble co-parenting.

---

[7]During the pendency of the case, Mother told the caseworker that "this CPS case is illegal[] and that she has special investigators that are investigating CPS and [Father]."

Father testified that when the Department began its investigation, he had concerns about Mother, including her deteriorating mental health, constantly reading tarot cards, and hiding of weapons.[8] When asked whether he had observed an improvement in Mother's mental health since the start of the case, Father testified, "I cannot say I have." Father went on to say, "I unfortunately still don't trust her. I'm just not comfortable with her."

Father confirmed that Matthew was doing well in his care and that he was receiving all of the necessary services for his diagnoses. And because Father and Mother did not see eye-to-eye on things, he agreed with the caseworker's assessment that he and Mother would have trouble co-parenting. Father requested to be appointed as Matthew's sole managing conservator and requested that Mother have supervised visitation.

The attorney ad litem for Matthew addressed the trial court and explained that it was her belief that it was in Matthew's best interest "for Father to have sole managing conservatorship and Mother to have supervised visitation only." The court-appointed special advocate also briefly discussed her observations of Father and Mother, stating that in her opinion, "it is in [Matthew's] best interest to remain in the stable home with his father."

_____

[8]Father explained that "[Mother], because of her paranoia, would strategically place [their] large kitchen knives under -- between cushions in the couch and on top of the fridge, in cabinets in the restroom, and the closets. And there was a gun in the house[,] and it could not be found."

10

After hearing all of the evidence, the trial court found that "it is in [Matthew's] best interest to appoint [Father] as [his] sole managing conservator." The trial court then signed the final order, appointing Father as sole managing conservator of Matthew and appointing Mother as possessory conservator with supervised visitation. Mother filed this appeal.

### III. STANDARD OF REVIEW

A trial court has broad discretion when determining family law matters involving custody, support, visitation, and possession. *In re P.J.*, No. 02-24-00236-CV, 2025 WL 807494, at *5 (Tex. App.—Fort Worth Mar. 13, 2025, no pet.) (mem. op.); *In re A.I.M.*, No. 01-22-00409-CV, 2023 WL 8192530, at *5 (Tex. App.—Houston [1st Dist.] Nov. 28, 2023, no pet.) (mem. op.). The best interest of the child is the trial court's primary consideration in determining such matters. *A.I.M.*, 2023 WL 8192530, at *5. The trial court has substantial latitude when making its determinations. *Id.*

We review conservatorship and visitation issues for an abuse of discretion. *Kazmi v. Kazmi*, 693 S.W.3d 556, 565 (Tex. App.—Austin 2023, pet. denied); *In re E.S.S.*, 658 S.W.3d 613, 616 (Tex. App.—El Paso 2022, no pet.); *In re R.R.K.*, No. 02-20-00302-CV, 2022 WL 1257136, at *3 (Tex. App.—Fort Worth Apr. 28, 2022, no pet.) (mem. op.). A trial court abuses its discretion when it acts without reference to any guiding rules or principles—that is, when its decision was arbitrary or

unreasonable.  *In re M.M.M.*, 307 S.W.3d 846, 849 (Tex. App.—Fort Worth 2010, no pet.).

In family-law cases, the abuse of discretion standard overlaps with the traditional sufficiency standards of review; thus, although legal and factual insufficiency are not independent reversible grounds of error, they are relevant factors in assessing whether the trial court abused its discretion.  *Kazmi*, 693 S.W.3d at 566; *Boyd v. Boyd*, 131 S.W.3d 605, 611 (Tex. App.—Fort Worth 2004, no pet.).  When a trial court relies on legally or factually insufficient evidence, it abuses its discretion. *P.J.*, 2025 WL 807494, at *5; *E.S.S.*, 658 S.W.3d at 616.

When assessing the legal sufficiency of the evidence, we view the record in a light most favorable to the ruling to determine whether there is more than a scintilla of evidence to support it.  *P.J.*, 2025 WL 807494, at *5; *E.S.S.*, 658 S.W.3d at 616.  For factual sufficiency, we consider and weigh all of the pertinent evidence to determine whether the credible evidence supporting the challenged finding is so weak or so contrary to the overwhelming weight of the evidence that it must be set aside.  *P.J.*, 2025 WL 807494, at *5; *E.S.S.*, 658 S.W.3d at 616.

Throughout our review, we defer to the trial court's assessment of the witnesses' credibility and demeanor.  *P.J.*, 2025 WL 807494, at *5.  If there is conflicting evidence, it is the trial court's prerogative to resolve the conflict and believe one witness over another.  *Id.*

12

## IV.  DISCUSSION

In her sole issue, Mother contends that because the evidence was factually insufficient to show a material and substantial change in her circumstances, the trial court abused its discretion by modifying the 2019 order—wherein she was named a joint managing conservator—and appointing her as possessory conservator with only supervised visitation.[9]  We disagree.

### A.  APPLICABLE LAW

A trial court may modify conservatorship of and possession of or access to a child if the modification is in the child's best interest and the circumstances of the child or a conservator have materially and substantially changed since the rendition of the existing order.[10]  Tex. Fam. Code Ann. § 156.101(a)(1); *In re A.E.A.*, 406 S.W.3d 404, 409 (Tex. App.—Fort Worth 2013, no pet.).

In deciding whether a material and substantial change of circumstances has occurred, a fact finder is not confined to rigid or definite guidelines; instead, the determination is fact specific and must be made according to the circumstances as

[9]She does not challenge the trial court's awarding Father the exclusive right to determine Matthew's primary residence.

[10]Mother challenges the sufficiency of the evidence to prove a material and substantial change but does not challenge or discuss the sufficiency of the evidence to show that the modification was in Matthew's best interest.  Therefore, we will limit our discussion to the issue of whether the evidence showed a material and substantial change in Mother's circumstances since the rendition of the 2019 order.  *See* Tex. R. App. P. 47.1

13

they arise. *See In re H.C.C.*, No. 01-16-00876-CV, 2017 WL 6520228, at *9 (Tex. App.—Houston [1st Dist.] Dec. 21, 2017, no pet.) (mem. op.). To demonstrate that a material and substantial change of circumstances has occurred, the evidence must show the conditions that existed at the time of the entry of the prior order as compared to the circumstances existing at the time of the trial on the petition to modify. *In re L.C.L.*, 396 S.W.3d 712, 718 (Tex. App.—Dallas 2013, no pet.).

A parent's deteriorating mental health can qualify as a material and substantial change that supports modification of conservatorship or limits on possession or access to the child. *See In re J.H.W.*, No. 14-03-00024-CV, 2004 WL 1263254, at *2–3 (Tex. App.—Houston [14th Dist.] June 10, 2004, no pet.) (mem. op.) (holding that a mother's threat to kill herself and a child, coupled with the mother's history of psychological issues, qualified as a material and substantial change); *see also In re O.E.W.-K.*, No. 02-10-00199-CV, 2011 WL 1225470, at *26 (Tex. App.—Fort Worth Mar. 31, 2011, no pet.) (mem. op.) (discussing that a parent's mental instability may contribute to a finding that a parent could endanger a child); *In re C.D.*, 664 S.W.2d 851, 853 (Tex. App.—Fort Worth 1984, no writ) (explaining that a parent's mental illness is a relevant factor on issues related to the care and custody of a child).

### B. SUFFICIENCY OF THE EVIDENCE SUPPORTING MODIFICATION

Mother argues that "the only evidence presented at trial was that [she] had a psychotic episode wherein she was involuntarily committed at JPS for nine days in December, 2024." But Mother's framing of her mental health belies the record.

The extent of her mental-health issues was not limited to an isolated episode. Rather, the evidence showed that Mother's mental health had deteriorated for months leading up to her involuntary commitment at JPS and that her mental health had not improved by the time of trial. Thus, as we discuss below, the record supports the trial court's finding that the circumstances of Mother's mental health had materially and substantially changed since the rendition of the 2019 order. *See* Tex. Fam. Code Ann. § 156.101(a)(1).

The trial court admitted Mother's JPS records. The records establish that Mother was admitted to JPS on a mental-health warrant for evaluation and treatment and show that prior to her admission, she had stopped sleeping, eating, and taking her medication and that she believed people were watching her in her home. The records also establish other matters illustrating Mother's mental-health issues, including her belief that she had "a bullet hole in the front of her skull from her last death," that she had "been chosen by everyone's ancestors to stop the country from being run by the government," "that people ha[d] been inhabiting the body of [Matthew]," and "that she ha[d] cameras in her eyes [so] that other people c[ould] watch and . . . see what she is seeing."

Mother's testimony at trial illuminated the Department's and Father's continuing concerns for her mental health. First, she disavowed the aforementioned statements contained in the JPS records, going as far as to claim that the medical providers were lying. Second, she denied experiencing any psychosis since her

15

discharge from JPS in December 2024 while simultaneously maintaining her supposed active employment with the DEA in an undercover capacity to investigate her stolen inheritance. Third, she maintained that Father was stealing her inheritance, that she did not understand why she was admitted to JPS, and that she felt fine following her discharge and did not seek further mental-health treatment.

Despite Mother's perception of her mental health, the caseworker testified that the results of Mother's mental-health assessment—rather than alleviate concerns for her mental health—had "continued the [Department's] concerns." In the same vein, Father testified that he still did not trust Mother and was "not comfortable with her." The caseworker and Father both testified that they had not observed an improvement in Mother's mental health since the beginning of the case.

Although Mother denied experiencing any psychosis since her discharge from JPS in December 2024, the trial court was not required to believe her. *See P.J.*, 2025 WL 807494, at *5. Instead, the trial court could have believed the caseworker's and Father's testimony that they had not noticed an improvement in Mother's mental health. *See id.* The trial court could have also considered Mother's persistence in disavowing her statements contained in the JPS records, downplaying the severity of her mental health, and maintaining her supposed undercover employment with the DEA. *See Jenkins v. Jenkins*, 16 S.W.3d 473, 477 (Tex. App.—El Paso 2000, no pet.) ("The trial court is in the best position to observe the demeanor and personalities of

16

the witnesses and can 'feel' the forces, powers, and influences that cannot be discerned by merely reading the record.").

Thus, the trial court could have reasonably found that the evidence proving a deterioration of Mother's mental health, her denial about that deterioration, and her refusal to obtain mental-health treatment and counseling qualified as a material and substantial change to support modification. *See In re K.R.*, No. 02-14-00275-CV, 2016 WL 1393392, at *3 (Tex. App.—Fort Worth Apr. 7, 2016, no pet.) (mem. op.) (holding that the deterioration of appellant's mental health after rendition of the divorce decree and her denial about that deterioration qualified as a material and substantial change to support modification).

We conclude that the record establishes that the evidence is factually sufficient to support the trial court's finding that there had been a material and substantial change in Mother's circumstances since the 2019 order appointing her and Father as joint managing conservators. *See* Tex. Fam. Code Ann. § 156.101(a)(1); *A.E.A.*, 406 S.W.3d at 409. Accordingly, we hold that the trial court did not abuse its discretion by modifying the conservatorship of Matthew—appointing Father as sole managing conservator and appointing Mother as possessory conservator with supervised visitation. *See P.J.*, 2025 WL 807494, at *5.

We overrule Mother's sole issue.

## V. CONCLUSION

Having overruled Mother's sole issue, we affirm the trial court's judgment. *See* Tex. R. App. P. 43.2(a).

/s/ Brian Walker

Brian Walker
Justice

Delivered:  January 15, 2026